# THE GERMANIC.

## CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 128.    Argued January 13, 16, 1905—Decided February 20, 1905.

A foreign vessel from Liverpool arrived at its destination, New York, and made fast to the wharf. Owing to unusual gales and weather she was heavily weighted with snow and ice and made top heavy. While the cargo was being unloaded she suddenly rolled over and sank, damaging the cargo remaining in her, some of which had been shipped from points east of Liverpool on bills of lading to Liverpool, thence to be forwarded to New York, and containing certain exemptions of the carrier from liability. The owners and insurers of cargo libelled the vessel; it was found by the District Court and the Circuit Court of Appeals that the damage was due to negligence in unloading cargo and ruled that the negligence fell within section one of the Harter Act and not within section three of the same as negligence in the navigation or management of the vessel. *Held,* that:

This court will not go behind the findings of the two courts as to negligence and that the rule was correct.

When a case may fall under section one and section three of the Harter Act the question which section is to govern must be determined by the primary nature and object of the acts which cause the loss.

*Semble.* The standard of conduct is external and not merely co-extensive with the judgment of the individual.

The Harter Act will be applied to foreign vessels in suits brought in the United States, and where claimants set up and rely upon the act they must take the burden with the benefits and cannot claim a greater limitation of liability under provisions of bills of lading.

THE facts are stated in the opinion.

*Mr. Everett P. Wheeler* for petitioner:

The Harter Act exempts the ship from liability. She was seaworthy when she left Liverpool and the cargo was in good order when she arrived in New York. Even if the captain was negligent his treatment of the ship and cargo was part of her management under the act. For history of the act see 24 Cong. Rec. 147, 171, 1180.

The exemption under the act continues until the cargo is delivered from the ship. *The Glenochil*, Prob. (1896) 10; *The Silvia*, 171 U. S. 462; *Knott* v. *Botany Mills*, 179 U. S. 69; *The Wildcroft*, 130 Fed. Rep. 521, affirming 124 Fed. Rep. 631; *The Rotherfield*, 8 Revue Int. du Droit Mar. 103. The object of the Harter Act is to regulate the relation between carriers and shippers. *The Delaware*, 161 U. S. 459; *The Viola*, 59 Fed. Rep. 632; *The Berkshire*, 59 Fed. Rep. 1007.

Both of the courts below held that the steamer was liable because a condition of instability brought about by improper unloading, care and custody of the cargo is not a fault in the management of the vessel. This was error. Cases cited *supra; Knott* v. *Botany Mills*, 76 Fed. Rep. 582; *The Mississippi*, 113 Fed. Rep. 985; *S. C.*, 120 Fed. Rep. 1020; *The Canon Park*, 15 Prob. Div. 203; *The Southgate*, Prob. (1893) 329, 337, all really support petitioner's contention.

Management of the vessel includes management of any part of the vessel. *Rowson* v. *Atlantic Transport Co.*, (1903) 1 K. B. Div. 114; *S. C.*, 9 Maritime Law Cas. U. S. 347; K. B., (1903) Div. 666; 19 Times L. R. 668; *The Rodney*, Prob. Div. (1900) 112, 117.

The doctrine of the opinions of the courts below are opposed to *The Sandfield*, 79 Fed. Rep. 371; *S. C.*, 92 Fed. Rep. 663; *Am. Sug. Rfg. Co.* v. *Rickinson*, 124 Fed. Rep. 188; *The Mexican Prince*, 82 Fed. Rep. 484; *S. C.*, 91 Fed. Fep. 1003. The loading and discharge of cargo and the coaling were under the captain's direction. He always has the control. The distinction is unimportant. *Int. Nav. Co.* v. *Farr & Bailey*

Co., 181 U. S. 218, 226; as to history of Harter Act see *The Delaware,* 161 U. S. 459.

To limit § 3 to management in reference to delivery of the cargo and not to handling of coal would be to interpolate language not contained in the act. The act was drawn with reference to business usage and general words must be given their general construction. *Demarest* v. *Wynkoof,* 3 Johns. Ch. 142; *United States* v. *Coombs,* 12 Pet. 72; *Chamberlain* v. *Transportation Co.,* 44 N. Y. 305; *So. Life Ins. Co.* v. *Packer,* 17 N. Y. 51. The Harter Act applies alike to foreign and domestic vessels. *The Chattahoochee,* 173 U. S. 540; *The Silvia,* 171 U. S. 642; *The Manitoba,* 104 Fed. Rep. 145, can be distinguished.

The bills of lading exempted the carrier for loss which would cover the damages in this case. *The Etona,* 64 Fed. Rep. 880; *S. C.,* 71 Fed. Rep. 895. The finding that the unloading was negligent is not tenable. The only mistake of the captain was in failing to see an extraordinary result of an unusual storm.

Negligence is an omission to judge or the neglect of some means reasonably adapted to guard against a danger which is reasonably to be expected. *The Adriatic,* 17 Blatch. 176; *S. C.,* 107 U. S. 512; *Int. Nav. Co.* v. *Farr & Bailey Co.,* 98 Fed. Rep. 636; *S. C.,* 181 U. S. 218, 227; *Brown* v. *French,* 104 Pa. St. 604, 608; *The Tom Lysle,* 48 Fed. Rep. 690; *Mason* v. *Ervine,* 27 Fed. Rep. 459; *Wilson* v. *Pilots,* 57 Fed. Rep. 227; *Williams* v. *Le Bar,* 141 Pa. St. 149; *The Luckenbach,* 109 Fed. Rep. 487; *Lawrence* v. *Minturn,* 17 How. 100; *Boyd* v. *Moser,* 7 Wall. 316; *Steam Trans. Co.* v. *Bank,* 6 How. 344.

It is only because an exemption from liability for negligence is against the policy of the law that libellants have any case at all. *R. R. Company* v. *Lockwood,* 17 Wall. 357, 362; *Crossman* v. *Burrill,* 179 U. S. 100. The captain's conduct should not be viewed in the light of subsequent events. *The Newfoundland,* 176 U. S. 97; *The Styria,* 186 U. S. 1, 9; *McClain*

v. *Brooklyn City R. R. Co.*, 116 N. Y. 459, 470; *The Maria Luigi*, 28 Fed. Rep. '244; *The Columbia R. R. Co.* v. *Hawthorne*, 144 U. S. 202, 208; *Hart* v. *Railroad Co.*, 21 Law Times (N. S.), 261.

No one is guilty of negligence by reason of failing to take precautions which no other man would be likely to take under the same circumstances. 1 Shearman & Redfield on Negligence, 4th ed., § 11; Wharton on Neg. § 46; *Nitro-Glycerine Cases*, 15 Wall. 524, 537; *The Timor*, 67 Fed. Rep. 356; Carver on Carriage by Sea, 3d ed., § 181.

The sinking of the Germanic was not only unexpected but it was unlike anything that ever occurred before in the history of the port. *Hibernia Ins Co.* v. *Trans. Co.*, 120 U. S. 166; *Stover* v. *Erie R. R.*, 95 Fed. Rep. 495. The captain was trying to have the steamer ready to sail. It is the duty of carriers to keep their contracts. *The Helios*, 115 Fed. Rep. 705; *S. C.*, 108 Fed. Rep. 279.

As to the effect of the insurance claims in the bill of lading providing that the shipowner is not liable for any loss capable of being covered by insurance and to his right of subrogation to insurance see *Rintoul* v. *N. Y. Cent. R. R. Co.*, 17 Fed. Rep. 905; *S. C.*, 20 Fed. Rep. 313; *Phœnix Ins. Co.* v. *Erie R. R. Co.*, 117 U. S. 312, 325; *Inman* v. *So. Car. Ry. Co.*, 129 U. S. 128; *The Egypt*, 25 Fed. Rep. 320.

*Mr. Walter F. Taylor*, with whom *Mr. Edmund Baylies* was on the brief, for respondent Aiken, and *Mr. Wilhelmus Mynderse* for certain insurance companies, respondents:

The disaster was the result of gross negligence, and as that fact was established in the lower courts it is not an open question in this court. *Compania De Navigacion La Flecha* v. *Brauer*, 168 U. S. 104; *Morewood* v. *Enequist*, 23 How. 491; *The Richmond*, 103 U. S. 540; *The Conqueror*, 166 U. S. 110, 135; *The Carib Prince*, 170 U. S. 655; *The Iroquois*, 194 U. S. 240, 247; *Int. Nav. Co.* v. *Farr & Bailey Co.*, 181 U. S. 218.

The Harter Act is not a defense, as the damage arose from causes specified in the first section of the act, *Knott* v. *Botany Mills*, 179 U. S. 69; *S. C.*, 76 Fed. Rep. 583, and not from faults or errors of navigation of the vessel within the third section of the act.

In most of the cases where the Harter Act has been held to exempt the owner from liability the negligence has not resulted in any injury to the vessel or affected her safety. In many of them, the negligence has involved peril to the cargo only, and has consisted solely in the use of the appliances of the ship, without due regard to the possible effect upon the safety of the cargo. *The Sylvia*, 171 U. S. 642; *The Wildcroft*, 130 Fed. Rep. 521; *The Rodney* (1900), Prob. Div. 112; *The Mexican Prince*, 82 Fed. Rep. 484; *The Sandfield*, 82 Fed. Rep. 663; *Rowson* v. *Atlantic Transport Company* (1903), K. B. Div. 666. These cases establish that the character of a fault, as a fault in the management of the ship, or as one for which the owner is responsible, is not to be determined by the fact that it affects the ship, or the nature or degree of the effect produced, but by reference to the nature of the operation which is negligently performed. *The Glenochil*, 1896, Prob. Div. 10, can be distinguished.

As to where the damage is attributed to unseaworthiness and not to a fault in her management see *The Oneida*, 128 Fed. Rep. 687; *The Elphicke*, 117 Fed. Rep. 272; *S. C.*, 122 Fed. Rep. 439. The tendency is to limit rather than extend the exemptions under the act. *The Delaware*, 161 U. S. 459; *The Irrawaddy*, 171 U. S. 187; *The Chattahoochee*, 173 U. S. 540; *The Carib Prince*, 170 U. S. 655. The disaster was not due to perils of the sea or the act of God. The insurance clauses of the bills of lading do not relieve the owners.

The provision that the shipowner shall not be liable for any loss capable of being covered by insurance is invalid. It is a direct violation of those provisions of the Harter Act which forbid any clauses relieving the shipowner from the general responsibility imposed upon him by law.

Even before the Harter Act this clause was condemned as invalid, because it was unreasonable in the eye of the law, in that it practically compelled a shipper to take insurance. *The Hadji,* 16 Fed. Rep. 861; *S. C.,* 20 Fed. Rep. 875; *The Egypt,* 25 Fed. Rep. 320.

The clause giving to the carrier the benefit of the shipper's insurance rests upon different principles but it did not form a part of the contract of carriage between Liverpool and New York. *Phœnix Ins. Co.* v. *Erie Trans. Co.,* 117 U. S. 312; *Liverpool & G. W. S. S. Co.* v. *Phœnix Ins. Co.,* 129 U. S. 397, 463.

MR. JUSTICE HOLMES delivered the opinion of the court.

This writ of certiorari brings up the record of two cases which were tried together upon libels filed by cargo owners and underwriters to recover for water damage done to goods on board the steamship Germanic. 107 Fed. Rep. 294; 124 Fed. Rep. 1. The steamer reached her pier in New York at about noon, Saturday, February 11, 1899. She was heavily coated with ice, estimated by the courts below at not less than 213 tons, and this weight was increased by a heavy fall of snow after her arrival. She was thirty-six hours late, and in order to sail at her regular time on the following Wednesday, began to discharge cargo from all of her five hatches at once. At the same time she was taking in coal from coal barges on both sides, to that end being breasted off from the dock twenty-five or thirty feet on her port side. At about 4 P. M. on Monday, February 13, she had discharged about 1,370 out of her 1,650 tons of cargo, including all but about 155 tons in the lower hold, the other 125 tons being on the orlop and steerage decks. She then had a starboard list of about 8°. At that moment she suddenly rolled over from starboard to port and kept a port list of 9° or more. As she rolled over the open cover of an aft coal port, about 33 inches by 22, was knocked off, leaving the bottom of the coal port about a foot above the water line.

Thereupon the master, who previously had given no attention to the discharge of cargo and loading of coal, ordered that coaling should be stopped on the port side but continued on the starboard, that no more cargo should be taken from the lower hold, and that some sugar in bags should be shifted to the starboard side.

When ten tons of sugar had been shifted, at 4.45 P. M., the steamer rolled back to starboard with a list of eight degrees as before. Coaling was resumed on the port side but at 6 was stopped on the starboard side. Between 6 and 9 P. M. all her side pockets were filled with coal up to the main deck, except one on the starboard, which lacked about thirty tons of being full. Some twenty or twenty-five tons were run into her cross bunkers in the lower part of the ship, which previously were about half full. About fifty tons of goods were discharged from the orlop and steerage docks, and about sixty tons of bacon were put on board and distributed evenly in the bottom of the hold. From 4.45 to 9 the starboard list was increasing constantly. At a little after 9 the steamer suddenly rolled over again to port, carrying the lower part of the open coal port below the water line. The pumps could not control the inflowing water and the ship sank before relief could be got. The damage to the goods was caused in this way.

The petitioner argues that the danger could not have been foreseen and that there was no negligence, attributing the loss to an unusual gale and special circumstances. But the District Court and the Circuit Court of Appeals agree that the loss was due to hurried and imprudent unloading, which brought the center of gravity of the ship five or six inches above the metacenter. As usual we accept their finding. *The Iroquois*, 194 U. S. 240, 247; *The Carib Prince*, 170 U. S. 655, 658. We see no sufficient reason to doubt that it was correct. With reference to a part of the argument we think it proper to say a word. It is quite true that negligence must be determined upon the facts as they appeared at the time and not by a judgment from actual consequences which then were not

to be apprehended by a prudent and competent man. This principle nowhere has been more fully recognized than by this court. *Lawrence* v. *Minturn,* 17 How. 100, 110; *The Star of Hope,* 9 Wall. 203. But it is a mistake to say, as the petitioner does, that if the man on the spot, even an expert, does what his judgment approves, he cannot be found negligent. The standard of conduct, whether left to the jury or laid down by the court, is an external standard, and takes no account of the personal equation of the man concerned. The notion that it "should be coextensive with the judgment of each individual," was exploded, if it needed exploding, by Chief Justice Tindal, in *Vaughan* v. *Menlove,* 3 Bing. N. C. 468, 475. And since then, at least, there should have been no doubt about the law. *Commonwealth* v. *Pierce,* 138 Massachusetts, 165, 176. Pollock, Torts, 7th ed., 432.

The foregoing statement, abridged from that of the District Court, which was accepted by the Circuit Court of Appeals, is sufficient to present the question which we have to discuss, if we add the finding of the latter court that after the Germanic was made fast she was given in charge of the shore agents of the owners and that they alone assumed direction of the discharging and loading of cargo and prepared her for the return voyage. The question is whether the damage to the cargo was "damage or loss resulting from faults or errors in navigation or in the management of said vessel," as was set up in the answers, in which case the owner was exempted from liability by § 3 of the Harter Act, or whether it was "loss or damage arising from negligence, fault, or failure in proper loading, stowage, custody, care, or proper delivery" of merchandise under § 1 of the same, in which case he could not stipulate to be exempt. The second section also recognizes and affirms the "obligations" "to carefully handle and stow her cargo, and to care for and properly deliver the same." Act of February 13, 1893, c. 105, 27 Stat. 445.

The petitioner contends that any dealing with the ship or cargo which affects the fitness of the ship to carry her cargo is

"management of the vessel," within the meaning of § 3. To support this contention the case of *The Glenochil* [1896], Prob. 10, is cited. There, after the arrival of the vessel in port and while she was unloading, the engineer, in order to stiffen the ship, let water into a ballast tank, and did it so negligently that the water got to and injured the cargo. The damage was held to result from fault in the management of the vessel within § 3, and the shipowner was held exempt. See *The Silvia*, 171 U. S. 462. We see no reason to criticise this decision, and therefore lay on one side at once the fact that the vessel had come to the end of her voyage and was in dock. We assume further that the captain retained authority over his ship, so that it was his power and perhaps his duty to intervene in any case that needed his control. On these assumptions the argument is that cargo has also a function as ballast, that if, for instance, the loss is caused by the improper shifting of pigs of lead, it does not matter whether they are called ballast or cargo, but in either case, so far as the change affects the fitness of the ship as a carrier, it is management of the vessel within the act. The thing done is the same and the name of the object cannot affect the result.

Nevertheless, in a practical sense, the ship was not under management at the time, but was the inert ground or floor of activities that looked not to her, but to getting the cargo ashore. And this consideration brings to light the limitation of the section, adopted by the court in *The Glenochil*, and sanctioned by this court in *Knott* v. *Botany Mills*, 179 U. S. 69, 73, 74, to faults "primarily connected with the navigation or the management of the vessel and not with the cargo." [1896] Prob. 15, 19. In the case supposed the name given to the pigs of lead is not important in itself, to be sure, but may indicate a difference in the purpose and character of the change of place. If the primary purpose is to affect the ballast of the ship, the change is management of the vessel, but if, as in view of the findings we must take to have been the case here, the primary purpose is to get the cargo ashore,

the fact that it also affects the trim of the vessel does not make it the less a fault of the class which the first section removes from the operation of the third. We think it plain that a case may occur which, in different aspects, falls within both sections, and if this be true, the question which section is to govern must be determined by the primary nature and object of the acts which cause the loss.

A distinction was hinted at in argument based on the fact that the damage was not to the cargo removed, but to that left behind in the ship. If the damage was attributable to negligence in unloading, it does not matter what part of the cargo is injured. The fact referred to does bring out, however, that the negligence in removing the cargo was negligence only because of its probable effect on the ship, and was negligence towards the remaining cargo, only through its effect on the ship. But, although this may be conceded, the criterion which we have given is undisturbed. That "in" which, as the statute puts it, the fault was shown was not management of the vessel, but unloading cargo; and, although it was fault only by reason of its secondary bearing, the primary object determines the class to which it belongs.

It is settled by repeated decisions that the Harter Act will be applied to foreign vessels in suits brought in the United States. The *Scotland*, 105 U. S. 24; *The Chattahoochee*, 173 U. S. 540. The claimant sets up the act and relies upon it. Under the cases it must take the burdens with the benefits, and no discussion of the terms of the bills of lading, if they might lead to a greater limitation of liability, is necessary. *Knott* v. *Botany Mills*, 179 U. S. 69; *The Kensington*, 183 U. S. 263, 269. Some of the bills of lading in evidence contain a clause to the further effect that the shipowers, if liable for a loss capable of being covered by insurance, shall have the benefit of any insurance on the goods. But these bills of lading were for transport to Liverpool, and while they provided for forwarding the goods at ship's expense to New York, the forwarding was to be on bills of lading issued by

the steamer sailing to that port, and subject to the stipulations, exceptions and conditions in those bills. We see no occasion to consider the questions which might be raised if the same stipulations were contained in the bills of lading to New York. See *Liverpool Steam Co.* v. *Phenix Insurance Co.,* 129 U. S. 397, 463; *Inman* v. *South Carolina Ry.,* 129 U. S. 128; *Phenix Insurance Co.* v. *Erie & Western Transportation Co.,* 117 U. S. 312.

*Decree affirmed.*